Judgment rendered April 9, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,195-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SYLVIA WOODS BROWN,                    Plaintiffs-Appellees
INDIVIDUALLY, AND ROY
BROWN, INDIVIDUALLY

versus

LSU HEALTH SCIENCES                    Defendants-Appellants
CENTER-SHREVEPORT
THROUGH THE BOARD OF
SUPERVISORS OF LOUISIANA
STATE UNIVERSITY
AGRICULTURAL AND
MECHANICAL COLLEGE;
ANTHONY H. SIN, M.D.; AND
WILLIS-KNIGHTON MEDICAL
CENTER

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 633,113

Honorable Christopher T. Victory, Judge

* * * * *

JEFFREY M. LANDRY                      Counsel for Appellants
Attorney General

LOUISIANA DEPARTMENT OF JUSTICE
By: Phyllis E. Glazer
    Lakeisha J. Johnson
    Timothy R. Wynn
    Assistant Attorneys General

THE TOWNSLEY LAW FIRM
By: Damon Louis Beard
    David Harmon Hanchey
    Sage Thibodeaux

Counsel for Appellees,
Sylvia Woods Brown
and Roy Brown

WATSON, BLANCHE, WILSON & POSNER
By: Courtenay S. Herndon
    Craig J. Sabottke
    Hunter J. Tassin

Counsel for Appellee,
Willis-Knighton Medical
Center

\* \* \* \* \*

Before STONE, STEPHENS, and MARCOTTE, JJ.

MARCOTTE, J., concurs in the result that a genuine issue of material fact exists.

STEPHENS, J., concurs for the reason set forth by Judge Marcotte.

**STONE, J.**

This appeal arises from the First Judicial District Court, the Honorable Chris Victory presiding. The plaintiffs are Sylvia Woods Brown ("Mrs. Brown") and Roy Brown ("Mr. Brown"), her husband. They sued alleging medical malpractice in the treatment of Mrs. Brown from April 24, 2018, to December 4, 2018, against three defendants: (1) LSU Health Sciences Center ("LSU"); (2) Willis Knighton Medical Center ("WK"); and (3) neurosurgeon Anthony Sin, MD ("Dr. Sin"). WK filed a motion for summary judgment ("MSJ");[1] the plaintiffs did not oppose it and are not the appellants in this matter. Rather, Dr. Sin and LSU opposed WK's MSJ and are the appellants herein. Finding, in effect, that the co-defendants/appellants failed to produce prima facie evidence of causation of injury on the part of WK, the trial court signed a judgment granting the MSJ on March 20, 2024, and dismissing all claims against WK with prejudice. WK's co-defendants appeal that judgment, arguing that they introduced prima facie evidence of WK's causation of injury to Mrs. Brown (i.e., the delay of the plaintiff's anti-infection surgery). For the following reasons, we reverse the trial court's judgment.

---

[1] WK's first MSJ asserted a complete lack of evidence that it breached the standard of care. In response, the appellants produced an expert report from neurosurgeon Dr. Marshall Cain opining that WK did breach the standard of care in failing to alert Dr. Sin of Mrs. Brown's condition at the time of her hospitalization from September 22 to October 25, 2018. Of particular importance are the results of the September 24, 2018, MRI indicating osteomyelitis and discitis; WK failed to notify Dr. Sin of this salient information. Dr. Cain was deposed, and therein he opined that this breach by WK did not cause Mrs. Brown "any additional harm," but did delay the anti-infection surgery. Accordingly, WK filed a second MSJ asserting a total lack of evidence of causation, and it is now before this court.

# FACTS[2]

On April 24 and 25, 2018, Dr. Sin performed spinal surgery on Mrs. Brown, which included implanting pedicle screws and other hardware in her spine as part of a lumbar fusion. Mrs. Brown was rehospitalized on July 24, 2018, complaining of clear drainage from the surgical wound and hypotension; at this point, her blood cultures were positive for MRSA, and MRI results indicated "fluid collection with air bubbles at the posterior epidural L2-5, [which was] concerning for abscess." Per the MRPO's description, there was no mention of osteomyelitis or discitis in these MRI results. At this point, Mrs. Brown was prescribed antibiotics to treat the infection.

On September 14, 2018, Mrs. Brown was again hospitalized, this time at DeSoto Regional Health System for a urinary tract infection ("UTI") and hypotension. Dr. Sin's September 15, 2018, notes concerning Mrs. Brown indicate that, at that time, Dr. Sin intended to get another MRI and possibly remove the hardware from her spine if this MRI showed signs of infection.

Mrs. Brown was transferred to WK on September 22, 2018, and remained in-patient until her discharge October 25, 2018. On September 24, 2018, an MRI was performed, and it indicated *inter alia* "extensive marrow edema throughout the lumbar spine from L1-L5," and that "the discitis and osteomyelitis would appear to be similar."[3] However, WK did not notify Dr.

---

[2] The appellants' brief to this court extensively cites exhibits that are not in the record, and bases many factual assertions in its narrative on such non-evidence. The only exhibits in the record are: (1) medical review panel opinions (MRPO); (2) Dr. Cain's deposition; and (3) an excerpt from Dr. Sin's deposition. However, all of the appellants' (non)exhibits are listed in the exhibit index of Dr. Cain's deposition and were apparently "admitted" pursuant to his authentication.

[3] "Discitis (or diskitis) is an inflammation or infection that develops between the intervertebral discs of the spine." *Richardson v. Cotter*, 51,637 (La. App. 2 Cir. 9/27/17),

Sin of these MRI results or of Mrs. Brown's hospitalization. Parenthetically, the MRPO completely fails to mention this MRI in its written reasons.

Mrs. Brown was hospitalized, yet again, on November 20, 2018; another MRI was performed and it again showed signs of spinal infection, i.e., "worsening osteomyelitis and discitis." This time, WK consulted Dr. Sin and he performed the surgery removing the hardware and irrigating the wound on December 4, 2018. Thereafter, Mrs. Brown fully and timely recovered from the infection without any noted resurgence.

Mrs. Brown instituted a medical review panel ("MRP") proceeding. The panel unanimously concluded that WK did not breach the standard of care. One panelist, Dr. Marco Ramos, concluded that in late July 2018, Dr. Sin should have surgically re-opened, explored, and irrigated the wound as an anti-infection measure, and thereupon determined whether to remove the hardware. Dr. Ramos said this course was required after, on July 25, 2018, Mrs. Brown's blood cultures tested positive for MRSA, and her MRI results "showed fluid collection with air bubbles in the posterior epidural L2-5 which was concerning for abscess." These MRI results, as summarized in the MRPO, make no mention of osteomyelitis or discitis. Dr. Ramos opined that the delay of the anti-infection surgery at this point caused harm to Mrs. Brown by prolonging her infection and making it more difficult to treat, and thus Dr. Sin breached the standard of care.[4]

---

245 So. 3d 136, 138 at n.1. "[O]steomyelitis is an inflammation of the bone marrow caused by bacteria that gain entry though a wound or injury." *Ketchum v. Roberts*, 12-1885 (La. App. 1 Cir. 5/29/14), 2014 WL 3510694, at n.14.

[4] In apparent self-contradiction, however, Dr. Ramos also opined that WK did *not* breach the standard of care by failing to inform Dr. Sin of the September 24, 2018, MRI results, which, *unlike* the July 2018 MRI, found extensive bone marrow edema and stated that "the discitis and osteomyelitis would appear to be similar."

***Dr. Cain's testimony.*** As previously mentioned, in district court proceedings, the co-defendants/appellants introduced in opposition to WK's MSJ the affidavit of a board-certified neurosurgeon, Dr. Marshall Cain.[5] He explained that an infection such as Mrs. Brown's should be treated: (1) first, only with antibiotics; and (2) if the antibiotics prove insufficient, then surgically—by incision, drainage, and irrigation along with potential hardware removal.

Importantly, in his deposition, Dr. Cain testified that WK's records indicate its failure to consult Dr. Sin regarding Mrs. Brown's condition during her hospitalization from September 22, 2018, to October 25, 2018. He opined that this *was* a breach of the standard of care on WK's part. That breach, he stated, delayed full treatment of her infection. In particular, he said, "one of the issues is the length of time…[before] she went back to surgery and had the hardware removed...there was a two-month period where…Dr. Sin didn't even know she was in the hospital, so that delayed treatment." He also stated that "her care was delayed in terms of hardware removal" because of WK's failure to consult Dr. Sin. He added, "I think the standard of care is to contact the surgeon that operated on the patient

---

[5] In his deposition, Dr. Cain stated that: (1) he reviewed Mrs. Brown's medical records from WK and other hospitals multiple times, and reviewed the MRPO, but not Dr. Sin's deposition; (2) he had performed "thousands" of surgeries such as Mrs. Brown's initial surgeries in this case (i.e., spinal fusion with implantation of hardware; then decompressive lumbar laminectomy, facetectomy, foraminotomy, and more fusions and hardware implants); (3) such is a common procedure; (4) a few (less than one percent) of his patients had experienced hardware failure and/or infection following this procedure; (5) he had performed such a surgery the week before his deposition; (6) he did not treat or speak with Mrs. Brown, nor did he speak with any doctors or nurses who treated her, nor anyone else regarding her; (7) he specifically recalled reviewing the relevant WK records at the time of his deposition.

4

if…[that patient has] a problem.  She apparently had an infection," Dr. Cain said, despite Mrs. Brown having negative blood tests at that point.[6]

Dr. Cain later testified again that WK breached the standard of care in not contacting Dr. Sin, and that this caused delay of the anti-infection surgery (after which the infection timely resolved without any noted resurgence).  He read aloud Dr. Sin's September 15, 2018, notes concerning Mrs. Brown—indicating that, at that time, Dr. Sin intended to get another MRI and possibly remove the hardware from her spine if this MRI showed signs of infection.

However, after reading aloud the September 24, 2018, MRI results, described *supra*, Dr. Cain stated it would not have been appropriate to remove the hardware from her spine "in September."  This he stated despite the fact that he had already testified repeatedly that WK's nonconsultation of Dr. Sin delayed the anti-infection surgery.  It appears that he believed that the September 24, 2018, MRI results were "basically" the same as the July 25, 2018, MRI results.  However, per the MRPO, the July 25, 2018, MRI results did not mention marrow edema or osteomyelitis/discitis; per Dr. Cain's recitation, the September 24, 2018, MRI results did mention all those factors.

Dr. Cain's further testimony indicates that he did not consider this delay an "additional injury," and that "[h]er delay of care didn't have anything to do with her problems."  However, he also testified that a spinal infection such as Mrs. Brown's can be severely painful, that the "most common" complaint for post-surgical spinal infection is pain, and that a

---

[6] The MRPO states that Mrs. Brown's blood cultures were negative when she was admitted to WK on September 22, 2018.

5

worsening infection can cause increased pain. He also stated that Mrs. Brown's spine got worse between July and December of 2018.

Dr. Cain also testified that he only reviewed medical records and MRP documents in preparation for his testimony. Other than asserting Mrs. Brown's delayed care caused her no "additional injury," he made no indication whatsoever that these records suggested to him that Mrs. Brown's spinal infection was painless, that it caused her no emotional suffering, or that she enjoyed her life as much while hospitalized at WK for over a month[7] with a spinal infection as much as she would have without that spinal infection.

***Dr. Sin's testimony.*** In his deposition, which was taken approximately 4 and 1/2 years after the events in question, Dr. Sin stated he did not: (1) recall whether WK consulted him regarding the September 24, 2018, MRI and associated hospitalization; (2) recall whether he ever reviewed WK records from that time period; or (3) know whether he would have performed the surgery sooner if WK had notified him of the September MRI results. He testified:

> Q. What if you were contacted [about plaintiff's condition], hypothetically, what would you have done?
>
> A. I don't know.
>
> Q. Can you say you would have done anything (indiscernible) (coughing in room) [?]
>
> A. I was not contacted.

## ISSUES

---

[7] (I.e., September 22 to October 25 of 2018.)

On appeal, the appellants argue: (1) there is prima facie evidence that the delay of the surgery resulted from a breach of the standard of care by WK; (2) that delay extended the duration of Mrs. Brown's infection;[8] (3) Dr. Sin's statement that he did not know whether would have performed the second surgery earlier had he been timely notified of the September 24, 2018, MRI results is not conclusive evidence in light of what he did once WK consulted him regarding similar MRI results in late November of 2018; (4) expert evidence of damages is unnecessary because a lay jury can reasonably conclude on its own that the delay caused Mrs. Brown additional pain and suffering. The appellants also (5) cite *Farooqui, infra,* as authority for the proposition that proof that a defendant's substandard care "was a substantial factor depriving the patient of some chance of a better outcome" suffices to establish causation of injury.

## LAW

After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the summary judgment evidence shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. *Peironnet v. Matador Res. Co.*, 12-2292 (La. 6/28/13), 144 So. 3d 791, 814.

"A genuine issue is one regarding which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no

---

[8] They argue that (a) the deposition of Dr. Cain; (b) the MRP opinion of Dr. Ramos; and (c) circumstantial evidence, namely, that Dr. Sin's response to the November 2018 MRI show that Dr. Sin would likely have responded the same to the September 24, 2018, MRI.

need for a trial on that issue and summary judgment is appropriate." *Hines v. Garrett*, 04-0806 (La. 6/25/04), 876 So. 2d 764. Furthermore, "[i]n determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence." *Marioneaux v. Marioneaux*, 52,212 (La. App. 2 Cir. 8/15/18), 254 So. 3d 13, 20-21. Thus, when the valid summary judgment testimony of one witness contradicts that of another, there is a genuine issue; to choose between them is to make a credibility determination, which is the function of a trial, not summary judgment.

La. C.C.P. art. 967(A) establishes the criteria that testimonial evidence must satisfy to invoke the presumption of credibility:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. The supporting and opposing affidavits of experts may set forth such experts' opinions on the facts as would be admissible in evidence under [La. C.E. art. 702], and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

If the expert opinion testimony meets these criteria, the prohibition on making credibility determinations on summary judgment extends to the expert's opinions; i.e., the opinion is deemed credible. *Tully v. Granillo*, 55,211 (La. App. 2 Cir. 4/24/24), 384 So. 3d 470, 484 (Stone, J., dissenting), *writ granted, decision rev'd*, 24-00794 (La. 10/15/24), 394 So. 3d 812. However, any testimony that is merely conclusory and fails to establish a factual foundation for the matters it concerns is ineffectual. *Nelson v. Shelat*, 54,099 (La. App. 2 Cir. 8/18/21), 325 So. 3d 1170, *writ denied,* 21-01354 (La. 11/17/21), 327 So. 3d 997; *Nelson v. Shelat*, 55,434 (La. App. 2 Cir. 2/28/24), 381 So. 3d 248.

"[F]actual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor." *Willis v. Medders*, 00-2507 (La. 12/8/00), 775 So.2d 1049, 1050. The intermediate appellate courts have reaffirmed this principle. *Wyrick v. Golden Nugget Lake Charles, LLC*, 20-0665 (La. App. 1 Cir. 12/30/20), 317 So. 3d 708; *Johnson v. Entergy Corp.*, 36,323 (La. App. 2 Cir. 9/20/02), 827 So. 2d 1234, 1237.

"The purpose of a motion for summary judgment is to weed out those cases where it is obvious that the evidence, even if accepted as true, is insufficient to establish an essential element of a party's case." *Id.* La. C.C.P. art. 966(D)(1) allocates the burden of proof on a motion for summary judgment as follows:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

Therefore, to avoid summary judgment, a nonmoving party who would bear the burden of proof at trial on the factual issues concerned in the MSJ needs only to introduce prima facie evidence of such facts. *McGee v. Ashford Place Apartments, LLC*, 54,795 (La. App. 2 Cir. 11/16/22), 351 So. 3d 899; *Cyprien v. Bd. of Sup'rs ex rel. Univ. of Louisiana Sys.*, 08-1067 (La. 1/21/09), 5 So. 3d 862, 866. "*Prima facie* evidence is defined as evidence sufficient to establish a given fact which, if not rebutted or

9

contradicted, will remain sufficient." *Ganey v. Cupstid*, 55,798 (La. App. 2 Cir. 8/28/24) 400 So. 3d 172, 2024 WL 3959267, *quoting Livingston Par. Sch. Bd. ex rel. Sales & Use Tax Div. v. Hwy 43 Cornerstore, LLC*, 12-0103 (La. App. 1 Cir. 5/23/12), 93 So. 3d 709.  If such nonmover fails to introduce prima facie evidence, there is no genuine issue of material fact.

Appellate courts review trial court decisions on summary judgment using the *de novo* standard of review.  *Catahoula Par. Sch. Bd. v. Louisiana Mach. Rentals, LLC*, 12-2504 (La. 10/15/13), 124 So. 3d 1065.

La. R.S. 9:2794(A) sets forth the essential elements of a medical malpractice action; they follow the traditional formulation of negligence – duty, breach, causation, and injury:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians...licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances...
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.[9]

A defendant assigning comparative fault to a co-defendant has the same burden of proof, as would the plaintiff.  La. C.C.P. art. 966(D)(1); La. C.C. art. 2323; *Pruitt v. Nale*, 45,483 (La. App. 2 Cir. 8/11/10), 46 So. 3d 780, 783; *Trahan v. Savage Indus., Inc.*, 96–1239 (La. App. 3 Cir. 3/5/97),

---

[9] The plaintiff must establish these elements by a preponderance of the evidence. *Id*.  If there are multiple sufficient causes of an injury, a party responsible for one of them may be liable regardless of the other (concurring) causes. Restatement (Third) of Torts: Liability for Physical Harm § 27 PFD No 1 (2005).  Thus, if Mrs. Brown would have needed to be hospitalized even without the infection, such would not absolve WK of liability for necessitating her hospitalization for the infection.

692 So.2d 490; *Otillio v. Entergy Louisiana, Inc.*, 02-718 (La. App. 5 Cir. 12/11/02), 836 So. 2d 293, 295. Accordingly, to defeat a co-defendant's MSJ, a defendant assigning comparative fault to the mover needs only to introduce prima facie evidence of the elements for which the MSJ claims proof is lacking. *McGee*, *supra*; *Cyprien*, *supra*.

Expert testimony is not binding on a jury:

> [A] jury may accept or reject the testimony of an expert in whole or in part...Further, a jury may substitute common sense and judgment for that of an expert when such substitution appears warranted on the record as a whole. (Internal quotation marks omitted).

*Ryan v. Zurich Am. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So. 2d 214, 222. One caveat to this principle is that expert evidence is necessary to establish the standard of care in a medical malpractice case. *Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So. 2d 1228, 1230. This requirement, however, does not extend to the breach and causation elements of a claim governed by La. R.S. 9:2794 in all cases. *Id.*

Moreover, the existence of general damages for pain and suffering and lost chance may be established by purely circumstantial evidence. *Est. of Adams v. Home Health Care of Louisiana*, 00-2494 (La. 12/15/00), 775 So. 2d 1064; *Ainsworth v. Am. Home Assur. Co.*, 17-0778 (La. App. 4 Cir. 2/21/18), 239 So. 3d 359, *writ denied*, 18-0582 (La. 6/1/18), 243 So. 3d 1061; *Jones v. Capitol Enterp., Inc.*, 11-0956 (La. App. 4 Cir. 5/9/12), 89 So. 3d 474, 506, *writ denied*, 12-1634 (La. 10/26/12), 99 So. 3d 651, *citing* Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 7–2(c)(1996).

*Est. of Adams*, *supra,* and *Ainsworth, supra,* recognized as prima facie proof purely circumstantial evidence of general damages. In *Est. of Adams*,

11

a nursing malpractice case under La. R.S. 9:2794, the patient was diabetic and had problems with her foot. As a result, she was hospitalized; her treating physician recommended amputation. She declined, was discharged from the hospital, and placed under the home health nursing care of the defendant. The patient was also prescribed orthopedic shoes. These caused her to develop a blister on her foot. The wound became infected with gangrene and her lower leg had to be amputated roughly two weeks after her aforementioned discharge from the hospital. The patient filed suit but died from unrelated causes approximately two years into the litigation. Neither the appellate court's opinion nor the supreme court's opinion mentioned the preservation of her testimony or its use in the litigation. The home healthcare provider filed a MSJ based on the plaintiff's total lack of admissible expert testimony asserting causation of damages. The trial court granted the MSJ in light of the uncontroverted expert testimony that amputation plaintiff's foot would have been necessary regardless of the defendant's allegedly substandard nursing. The supreme court reversed, holding:

> [T]he admitted negligence clearly caused *some* damages, even if it merely hastened the amputation by one day. Plaintiff's damages for *pain and suffering* during the period of negligence, for *aggravation* of her medical condition, and for *loss of any chance* of saving her foot *or of delaying the amputation* is more appropriately decided by trial on the merits, even if plaintiff's case regarding the *amount* of damages is considerably weakened by the dearth of expert testimony. (Emphasis added).

*Id.* at 1064-65. The supreme court cited approvingly the dissent of the appellate court, which stated:

> [E]xpert testimony by a physician was not required to establish some degree of damages and thereby defeat the motion for summary judgment. Amputation of plaintiff's

> leg was required, even if only hastened by one day,
> following alleged sub-standard care by defendant.
> Plaintiff's damages are obvious and the exact amount of
> those damages can be established at the trial on the merits.

*Est. of Adams v. Home Health Care of Louisiana*, 99-1263 (La. App. 5 Cir. 7/25/00), 767 So. 2d 855, 859–60, *judgment set aside,* 00-2494 (La. 12/15/00), 775 So. 2d 1064.

Given the absence of both patient testimony and expert testimony (regarding pain and suffering or lost chance of a better outcome), the supreme court's holding necessarily implies that the patient's gangrene infection *alone* was prima facie evidence of those items of damage, albeit purely circumstantial.

What is implied in *Est. of Adams*, *supra*, is stated explicitly in *Ainsworth*, *supra*, which involved a survival action for pain and suffering against a hospital. In *Ainsworth*, the court stated that the deceased patient's testimony was neither preserved nor reflected in her medical records nor otherwise used in the litigation; nor did the plaintiff adduce expert testimony to establish pain and suffering. However, the plaintiff did introduce a fact witness's testimony establishing the substandard conditions to which the plaintiff was subjected—namely, "unbearable" heat and lack of clean water resulting from the non-evacuation of the defendant hospital (located in New Orleans) prior to the impending landfall of Hurricane Katrina. The court of appeal reversed the trial court's grant of summary judgment in favor of the defendant hospital:

> To begin with, Ms. Ainsworth seeks general damages for
> pain and suffering. She alleges that because of Touro's
> actions and inactions, her mother experienced physical and
> emotional symptoms of dehydration, overheating,
> exhaustion, mental anguish, fear, stress, anxiety, and
> depression. *The question is whether the admitted failures*

13

> *of Touro, if proven at trial, are so obvious that a lay*
> *person could rely on their common knowledge without the*
> *aid of expert testimony to determine the harm, if any,*
> *resulting to Ms. Ainsworth's mother*...We find that the
> physical and emotional symptoms Ms. Ainsworth claims
> her mother suffered are within the common knowledge of
> an average lay person or trial court to understand…Given
> the facts presented, we find medical expert testimony is
> not required to establish causation for temporary pain and
> suffering. (Emphasis added.)

*Id.*

Additionally, "[t]he Louisiana courts have deemed *any* lost chance of a better outcome[,] [however slight,] a compensable injury in a medical malpractice action." *Farooqui v. BRFHH Shreveport, LLC*, 55,081 (La. App. 2 Cir. 11/15/23), 374 So. 3d 364, 366–67, *writ denied,* 23-01661 (La. 2/14/24), 379 So. 3d 27.

*Smith v. State, Dept. of Health and Hospitals*, 95-0038 (La. 6/25/96), 676 So. 2d 543, reminds that, in a lost chance case, the burden of proof by preponderance of the evidence remains:

> Allowing recovery for the loss of a chance of survival is
> not...a change or a relaxation of the usual burden of
> proof by a preponderance of the evidence. Rather,
> allowing such recovery is a recognition of the loss of a
> chance of survival as a distinct compensable injury
> caused by the defendant's negligence, to be
> distinguished from the loss of life in wrongful death
> cases, and there is no variance from the usual burden in
> proving that distinct loss.
> …
> [T]he plaintiff must prove by a preponderance of the
> evidence that the tort victim had a chance of survival at
> the time of the professional negligence and that the
> tortfeasor's action or inaction deprived the victim of all
> or part of that chance

*Smith*, *supra*, recognized lost chance of *survival* as an item of compensable damage. However, lost chance of *a better outcome* is also a compensable injury in the Louisiana jurisprudence. *Burchfield v. Wright*, 17-1488 (La. 6/27/18), 275 So. 3d 855, 863. Therein the court explained:

> The loss of a chance of *a better outcome* is a theory of recovery recognized in...[Louisiana jurisprudence]. It is not a separate cause of action distinct from a statutory malpractice claim...[A] plaintiff may carry his burden of proof by showing that the defendant's negligence was a substantial factor *in depriving the patient of some chance of...a better outcome*...Consequently, the plaintiff does not have to shoulder the burden of proving the patient would have survived if properly treated; he need only demonstrate the decedent had a chance of…[a better outcome] that was denied him as a result of the defendant's negligence. (Emphasis added.)

*Est. of Adams*, *supra*, held that the lost chance of delaying necessity of an amputation by one day constituted a compensable injury, i.e., the lost chance of a better outcome. The court recognized delaying the necessity of amputation by one day a better outcome.

## ANALYSIS

Dr. Cain's expert testimony, combined with the respective MRI results and Dr. Sin's September 15, 2018, notes, constitute prima facie evidence that WK, in failing to consult Dr. Sin, delayed the anti-infection surgery which ultimately resolved Mrs. Brown's spinal infection. The prolonged existence of the infection, and the approximate 33-day hospitalization which that prolongment necessitated, are prima facie evidence that the delay caused Mrs. Brown to suffer general damages. Because this is a difficult case, we provide a thorough explanation.

***Causation of delay.*** Dr. Cain testified that WK delayed the anti-infection surgery by its failure to consult Dr. Sin concerning Mrs. Brown's hospitalization at WK from September 22 to October 25 of 2018. That consultation, had it actually occurred, would have included the September 24, 2018, MRI results showing that "in the interval there appears to be development in extensive marrow edema throughout the lumbar spine from

15

L1-L5," and that "the discitis/osteomyelitis would appear to be similar." In contrast, no such mention was made in the MRPO's rendition of the July 25, 2018, MRI results, i.e., the most recent MRI results known to Dr. Sin until Dr. Sin was notified of the late-November 2018 MRI on or about November 21, 2018.

Dr. Cain's testimony alone constitutes prima facie evidence that WK, more likely than not, caused the delay of the anti-infection surgery from September 24 until November 21, 2018. In the absence of a timely objection, Dr. Cain's testimony is deemed by law to be credible for purposes of summary judgment. *Tully*, *supra*. Furthermore, Dr. Sin's notes and actions corroborate Dr. Cain's testimony: (1) his September 15, 2018, notes indicated he wanted an MRI then and may have removed the hardware then if the MRI showed infection; and (2) after seeing the November 21, 2018, MRI results showing "worsened discitis/osteomyelitis," Dr. Sin responded by surgically removing the hardware and irrigating the wound—within two weeks of this MRI.[10] WK's causation of this delay is established for purposes of the appellants' opposition to WK's MSJ.

In justifying our conclusion regarding causation, there are statements by Dr. Cain and Dr. Sin which must be addressed for the sake of judicial transparency. Dr. Cain made two particular statements in his deposition that require discussion: (1) he summarized the September 24, 2018, MRI results as "basically saying it hasn't progressed"; and (2) based on that understanding of the September 24, 2018, MRI results, he did not think it

---

[10] Dr. Sin performed this surgery on December 4, 2018. The results of the late-November 2018 MRI are not in the record, but they are discussed in the MRPO as being "compatible with worsened discitis/osteomyelitis."

16

would have been appropriate to remove the hardware in September 2018. These statements do not conflict with a prima facie showing that the nonconsultation caused some delay. First, they must be understood in context—not as sound bites. Elsewhere in his deposition, Dr. Cain stated multiple times that WK's nonconsultation of Dr. Sin delayed proper treatment. Second, the latter statement must not be expanded beyond what it actually says, i.e., only that hardware removal would not have been appropriate *in September*, i.e., within the immediately following six days after these MRI results of September 24, 2018. The latter statement says nothing about surgery involving *only* incision and drainage/wound irrigation being improper during those six days, nor anything about hardware removal in *October or November* of 2018. Taken in context, these statements by Dr. Cain do not and cannot preclude a prima facie showing of causation of *some* delay.

Additionally, we must acknowledge that Dr. Sin testified that he did not "know" whether he would have performed that surgery earlier had WK timely consulted him. The record contains only a one-page excerpt of his deposition testimony—which does not overtly explain what Dr. Sin meant by this. However, the excerpt does provide important context: (1) Dr. Sin also denied any recollection of ever reviewing the relevant WK records (of September 22 to October 25, 2018); and (2) Dr. Sin's deposition was taken approximately 4 and 1/2 years *after* the events in question. Under these circumstances, a reasonable factfinder could interpret Dr. Sin's statement as meaning that, as of his deposition taken 4 and 1/2 years after the fact, he was *uncertain* whether he would have performed the anti-infection surgery sooner either because he did not remember the relevant facts or never

17

reviewed the subject records in the first place.[11]  Therefore, the court is mandated to adopt that construction for purposes of WK's MSJ.  *Willis, supra*; *Wyrick, supra.*

Accordingly, Dr. Sin's testimony would not preclude a factfinder from reasonably concluding, based on Dr. Cain's testimony and the corroborating evidence, that WK delayed Dr. Sin's performance of the anti-infection surgery.  In other words, a reasonable factfinder could still conclude that Dr. Sin *more likely than not* would—or at a minimum *might*—have performed the anti-infection surgery sooner but for WK's failure to consult him.  La. R.S. 9:2794 does not require certainty, but merely a preponderance of the evidence.  Regardless, under any construction, Dr. Sin's denial of knowledge no more *refutes* the contention that he would have performed the surgery earlier had he been timely consulted than it *supports* that contention.

*General damages.*  The remaining issue is whether there is, in the summary judgment evidence, prima facie proof that the delay caused *damages* to Mrs. Brown.  For several reasons, we hold that it does, even though it may not have changed the ultimate outcome of Mrs. Brown's treatment.  First, but for this delay of the anti-infection surgery, Mrs. Brown's infection presumably would have been eradicated sooner.  This can be reasonably inferred from the undisputed fact that, only after the anti-infection surgery was completed, the infection resolved timely and without noted resurgence.  Therefore, *to the extent WK prolonged the infection*, WK, in effect, empirically and proximately *caused* the infection.  Second, this

---

[11] In generally prevailing usage, knowing a fact is roughly equivalent to being certain as to the existence of a fact.

18

prolongment resulted in Mrs. Brown being subjected to over a month of otherwise unnecessary hospitalization. Third, the infection worsened during this delay: thus, the delay also *aggravated* Mrs. Brown's pre-existing infection. This suffices as prima facie evidence of past pain and suffering, past hedonic damages,[12] and lost chance of a better outcome, i.e., eliminating the infection sooner. *Est. of Adams*, *supra;*[13] *Ainsworth*, *supra*. The appellants are not at this point required to prove quantum—merely the existence of damages. *Est. of Adams*, *supra*.

Likewise, the appellants are not required to rebut Dr. Cain's statement—that the delay caused "no additional injury" to Mrs. Brown—to defeat WK's MSJ. *Ganey*, *supra*. For the purpose of defeating WK's MSJ, their burden is *only* to introduce prima facie evidence of WK's causation of damages to Mrs. Brown. La. C.C.P. art. 966(D)(1); *McGee*, *supra*; *Cyprien*, *supra*. As explained above, the appellants have appropriately done so. In determining whether prima facie evidence has been established, rebuttal evidence is disregarded. *Ganey*, *supra*. Thus, to hold that Dr. Cain's statement —i.e., that the delay caused "no additional injury"—negates the circumstantial evidence that the delay caused damages to Mrs. Brown (as discussed above) would misunderstand the entire concept of prima facie evidence. In other words, assigning any significance to this statement by Dr. Cain in determining whether the *appellants* carried *their* burden under La.

---

[12] A jury could reasonably infer that Mrs. Brown enjoyed her life less while hospitalized because of a spinal infection than she would have without a spinal infection and without hospitalization.

[13] As previously noted, the supreme court in *Est. of Adams* recognized the lost chance of delaying amputation by one day as compensable injury—*i.e.*, lost chance of a better outcome.

C.C.P. art. 966(D)(1) would constitute *weighing evidence*, which is strictly verboten on summary judgment. *Marioneaux, supra.*

Even if we could weigh this statement ("no additional injury") against the positive evidence of general damages, construing this statement as WK suggests would constitute an inversion of a bedrock principle of summary judgment: courts are mandated to resolve all doubt in favor of to the nonmoving party and draw all reasonable inferences in favor of the nonmover. *Johnson*, *supra*; *Willis*, *supra*; *Wyrick*, *supra*. A factfinder could reasonably conclude that Dr. Cain intended for this statement to mean only that, despite the delay, Mrs. Brown obtained the *same ultimate medical outcome*. Stated conversely, a factfinder could reasonably conclude that Dr. Cain did *not* mean that: (1) while hospitalized with a spinal infection from September 22 to October 25, 2018, Mrs. Brown enjoyed her life just as much as she would have otherwise; (2) she did not experience any physical pain or emotional suffering (e.g., fear, anxiety, stress) during that time as a result of the spinal infection; and (3) eliminating the spinal infection earlier would not have been a better medical outcome for Mrs. Brown.

This is especially so given that Dr. Cain testified that a spinal infection such as Mrs. Brown's can be severely painful, that the "most common" complaint for post-surgical spinal infection is pain, and that a worsening infection can cause increased pain. Finally, Dr. Cain testified that he only reviewed medical records (including MRP documents) in preparation for his testimony. Aside from his totally conclusory assertion that the delay caused Mrs. Brown "no additional injury," he made no indication whatsoever that these records asserted or implied that *Mrs. Brown's* spinal infection was painless, that it caused her no emotional

20

suffering, that she enjoyed being hospitalized at WK for over a month as much as she would have enjoyed being infection-free and free from the hospital during that time, or that being rid of her infection a month or two sooner would not have been a better outcome for her. Thus, reading his testimony *as a whole*, Dr. Cain clearly did not claim to know or believe that Mrs. Brown actually experienced zero physical pain, zero emotional suffering, and zero loss of enjoyment of life because of the delay.

Furthermore, *if* Dr. Cain's statement were misinterpreted as intending that, during the prolongment of her infection, Mrs. Brown *in fact* did not experience any such general damages, *then* his statement is totally ineffective because his entire deposition fails to establish any foundation whatsoever for how he could know that. La. C.C.P. art. 967(A); *Nelson*, *supra*. Dr. Cain admittedly never spoke with Mrs. Brown or any other fact witness. Instead, he relied entirely on medical records which are not in the record on appeal. Other than his conclusory statement that Mrs. Brown experienced no "additional injury," Dr. Cain never stated or implied that those medical records somehow indicated the nonexistence of such general damages. This statement by Dr. Cain, so misinterpreted, fails the criteria of La. C.C.P. art. 967(A). A factfinder does not need any "help" from an expert, via his conclusory assertions (or otherwise), to determine that Mrs. Brown suffered general damages. *Est. of Adams*, *supra*; *Ainsworth*, *supra*; La. C.E. art. 702(A). Rather, such a statement would amount to officious overreach. Thusly (mis)construed, Dr. Cain's statement is without effect. *Nelson*, *supra*.

Finally, if Dr. Cain meant that *he* does not consider physical pain, emotional suffering, loss of enjoyment of life, and lost chance of being rid of

21

the infection sooner to be "additional injuries," then he thereby uttered an irrelevancy: for it is the law, not Dr. Cain, that defines compensable injuries.

## CONCLUSION

The trial court judgment is **REVERSED**.  The costs of this appeal are taxed to the appellee.